**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 17-cv-00321-CMA

COLORADO PRAIRIE INITIATIVE, a Colorado nonprofit corporation,

      Petitioner,

v.

MARTY LOWNEY, in his official capacity as the Colorado State Director for USA-APHIS
Wildlife Services,
JASON SUCKOW, in his official capacity as the Western Regional Director for USA-
APHIS Wildlife Service, and
ANIMAL AND PLANT HEALTH INSPECTION SERVICE – WILDLIFE SERVICES, a
federal agency of the United States Department of Agriculture,

      Respondents.

---

## ORDER AFFIRMING AGENCY ACTION

---

      This matter is before the Court for review of an agency action pursuant to the

Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.* The Court has reviewed

the Administrative Record, the Plaintiff's opening brief (Doc. # 25), the Defendants'

response brief (Doc. # 31), and the Plaintiff's reply brief (Doc. # 34). The Court holds

that the agency action in this case was not arbitrary, capricious, or otherwise contrary to

law.

## I.  BACKGROUND AND PROCEDURAL HISTORY

      The Colorado Prairie Initiative ("CPI") is challenging two actions by the United

States Department of Agriculture's Animal and Plant Health Inspection Service ("APHIS"

or the "Agency"). (Doc. # 1 at 2.) CPI is a Colorado-based organization that advocates for the conservation and restoration of prairie ecosystems. (*Id.* at 3.) It seeks to establish and protect natural prairies across Colorado "sufficient to allow the reintroduction and survival of charismatic species such as bison, elk, and wolves." (*Id.*) CPI's members assert that they recreate throughout Colorado and enjoy observing prairie dogs and their predators. (*Id.*)

CPI challenges the Agency's prairie dog removal and control operations in Colorado. (*Id.* at 2.) It claims that "[w]ithout proper analysis, [the Agency's actions] risk the populations of not only prairie dogs, but also the myriad grassland species that rely on and associate with the prairie dog colonies." (*Id.* at 4.)

The black-tailed prairie dog is a rodent that is both a benefit and a nuisance to the United States. According to studies, prairie dogs support ecosystems because, by way of example, animals like the horned lark, killdeer, and burrowing owl survive by preying on these prairie dogs. (AR at 47.) Further, studies demonstrate that the presence of prairie dogs increases the diversity and abundance of birds like the golden eagle, the bald eagle, and the ferruginous hawk. *See* (AR at 46.) Prairie dog removal or control programs can therefore "potentially influence birds and small rodents common on prairie dog towns." (AR at 47.)

The federal government began population control of prairie dogs in 1915 to protect Colorado's rangelands and ranchers. (AR at 68.) Many rural landowners and ranchers view prairie dogs as destructive and as a danger to health, safety, and property. (Doc. # 31 at 8.) Landowners often express concern about the transmission of

diseases carried by these prairie dogs. (*Id.* at 11.) Prairie dogs and cattle have similar diets, meaning less food available for livestock during the growing season where prairie dogs are present. (AR at 458.) Additionally, because birds prey on prairie dogs, airport locations near prairie dog habitats can be dangerous, due to the airplanes' risk of striking feeding birds. (AR at 544–45.)

The task of balancing the benefits and costs of these black-tailed prairie dogs falls on each state. (Doc. # 31 at 9.) However, the Secretary of Agriculture is authorized to carry out wildlife control programs to protect the nation's agricultural resources. 7 U.S.C. §§ 8351–53. The Agency therefore plays a role in the control and management of prairie dogs. *See* 7 C.F.R. §§ 2.80(a)(26), (27). The Agency's management program includes lethal or non-lethal measures against prairie dogs to protect agricultural resources. (Doc. # 31 at 11.) It also includes activities to protect and enhance wildlife, including programs to protect prairie dogs and to prevent the spread of disease among prairie dog colonies. (*Id.*)

Unsatisfied with the manner in which the Agency was managing the prairie dog populations in Colorado, CPI petitioned the Agency on April 30, 2016, for a rulemaking to create a more detailed environmental analysis of the Agency's actions. (Doc. # 25 at 10.) The Agency denied the petition, stating that its actions were properly excluded from an in-depth environmental analysis. (*Id.*) On November 4, 2016, CPI sought through the Freedom of Information Act ("FOIA") information about the Agency's prairie dog management activities. (*Id.*)

Through the FOIA request, CPI learned of the Agency's activities in Colorado regarding prairie dog removal and control operations. For example, it learned that on April 11, 2016, the Agency approved a control operation for black-tailed prairie dogs in a private landowner's pasture in Adams County, Colorado. (AR at 1.) The operation was meant to reduce damage by prairie dogs to seventy acres of pasture and rangeland. (*Id.*) The operation was scheduled to be completed by April 14, 2017. (AR at 2.) CPI also learned that on October 5, 2016, the Agency approved a removal operation for black-tailed prairie dogs in Pueblo County, Colorado. (AR at 5.) The Colorado Department of Transportation sought to develop six acres of land to construct its regional headquarters. (Doc. # 31 at 12.) It thus requested the Agency's assistance in removing the prairie dogs. (*Id.*) This operation was set to be completed on February 28, 2017. (AR at 6.)

Notwithstanding these operational deadlines, the Agency actually concluded its work at both sites three months prior to the commencement of this suit. (Doc. # 31 at 2.) CPI filed its suit on February 3, 2017, alleging that the Agency violated the National Environmental Policy Act ("NEPA"), its implementing regulations, and the Administrative Procedure Act. (Doc. # 1 at 9-11.) The Agency maintains that its activities were categorically excluded from the procedural requirements in NEPA.

## II.  LEGAL FRAMEWORK

NEPA is a procedural statute that ensures that federal agencies consider the environmental impact of their actions. 42 U.S.C. § 4332(2)(C). NEPA does not mandate certain results from or impose substantive limits on agency conduct, but it does dictate

the process agencies must follow in examining the impact of their actions on the environment. *Utah Envtl. Cong. v. Russell*, 518 F.3d 817, 821 (10th Cir. 2008). Satisfying NEPA's requirements usually necessitates that prior to acting, an agency must either prepare some kind of environmental analysis or determine that the action is excluded from such analysis. *Id.* For example, an agency that determines through its regulations that certain actions significantly affect the quality of the environment must prepare an environmental impact statement ("EIS") before undergoing such action. 40 C.F.R. § 1501.3; 7 C.F.R. § 372.5(a). An agency can also prepare an environmental assessment ("EA") for certain actions to determine whether an EIS is even necessary. 40 C.F.R. § 1501.4; 7 C.F.R. § 372.5(b). Finally, an agency can determine through its regulations that certain actions are categorically excluded from the requirement that agencies conduct either an EA or EIS. 40 C.F.R. § 1501.4; 7 C.F.R. § 372.5(c).

Actions that are categorically excluded from an EA or EIS are those that do "not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4. The purpose of these categorical exclusions is to promote efficiency and avoid wasting resources on agency actions that are unlikely to have a significant environmental impact. *Russell*, 518 F.3d at 821.

APHIS enacted regulations identifying those actions that are categorically excluded from NEPA's procedural requirements. *See generally* 7 C.F.R. § 372.5(c). Pertinent to this case, APHIS categorically excludes "routine measures," including wildlife control and removal actions with the use of "chemicals, pesticides, or other potentially hazardous or harmful substance[.]" 7 C.F.R. § 372.5(c)(1)(i). Such control

and removal activities are exempted only if they meet four requirements: (1) the activities are localized or contained in areas where humans will likely not be exposed; (2) the activities will not cause contaminants to enter bodies of water; (3) the activities will not adversely affect federally protected species or habitat; and (4) the activities will not cause bioaccumulation. *Id.*

Finally, agencies must also provide for "extraordinary circumstances in which a normally excluded action may [have] a significant environmental effect." 40 C.F.R. § 1508.4. When a decision maker from the agency determines that a categorically excluded action may significantly affect the quality of the environment, an EA or EIS must be prepared. 7 C.F.R. § 372.5(d). Such actions causing significant environmental effects can include routine measures, "the incremental impact of which, when added to other past, present, and reasonably foreseeable future actions . . . [have] the potential for significant environmental impact[.]" *Id.* at § 372.5(d)(1).

### III.   JURISDICTION AND VENUE

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2202. Venue is proper pursuant to 28 U.S.C. § 1391(e).

### IV.   STANDARD OF REVIEW

A reviewing court is asked to determine whether an agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law pursuant to 5 U.S.C. § 706(2)(A). The agency's decision that its actions fell within one of its categorical exclusions will therefore only be set aside if the court determines that the decision was arbitrary and capricious. *Citizens' Comm. to Save Our Canyons v. U.S.*

*Forest Serv.*, 297 F.3d 1012, 1023 (10th Cir. 2002). This requires the court to determine whether the agency "examined the relevant data and articulated a rational connection between the facts found and the decision made." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1576 (10th Cir. 1994) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)).

In terms of the agency's interpretation and application of its own regulation on categorical exclusions, a court grants the agency's application and interpretation controlling weight unless plainly erroneous or inconsistent with the terms of the exclusion. *Thomas Jefferson v. Shalala*, 512 U.S. 504, 512 (1994). So long as the agency articulated a rational basis for its interpretation and application, and considered all the relevant factors, the court will uphold the agency's action. *Copart, Inc. v. Admin. Review Bd., U.S. Dep't of Labor*, 495 F.3d 1197, 1202 (10th Cir. 2007); *Olenhouse*, 42 F.3d at 1576 (explaining the inquiry is whether the agency "articulated a rational connection between the facts found and the decision made").

While the standard of review is deferential to agencies, it does not "shield [agency actions] from a thorough, probing, in-depth review." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971). Agency actions can be set aside as arbitrary and capricious for several reasons: the agency relied on factors Congress did not intend for it to consider; the agency completely failed to consider pertinent aspects of the problem; or the agency's explanation for its action is counter to the evidence before it or is so implausible that it can be neither a difference of opinion nor a product of agency expertise. *State Farm*, 463 U.S. at 43. In reviewing an agency's action, the

Court cannot substitute its own judgment where the agency's action is based on inadequate or improper grounds. *SEC v. Chenery*, 332 U.S. 194, 196 (1947). The agency's action can only be upheld on the basis articulated by the agency itself. *State Farm*, 463 U.S. at 50.

## V.   ANALYSIS

At the initial stage, the parties disagree on the question of standing. Thus, before the Court can determine whether the Agency's actions were arbitrary and capricious, it must determine whether CPI has standing to bring this case. For the reasons set forth below, the Court finds that it does.

## A.   STANDING OF CPI TO CHALLENGE ACTIONS

The party invoking federal jurisdiction bears the burden of establishing standing. *Clapper v. Amnesty Int'l*, 568 U.S. 398, 411–12 (2013) (citation omitted). An organization establishes standing when one of its members has standing, when the interests it seeks to protect are germane to the organization's purpose, and when neither the claim asserted nor the relief requested requires the participation of individual members. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

In this case, CPI seeks to protect environmental interests germane to its purpose of conserving and restoring Colorado's prairie ecosystems. (Doc. # 25 at 8.) It asserts, without any challenge by the Agency, that neither the claim asserted nor the relief requested requires the participation of its individual members. (Doc. ## 25 at 8; 31 at 18.) The parties' only dispute with respect to standing is whether an individual member of the organization has standing.

First, a party must have statutory standing. *See Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 448 (10th Cir. 1996). NEPA does not contain a private right of action for those seeking to enforce its procedural requirements. *Id.* Plaintiffs seeking standing under NEPA must therefore rely on the Administrative Procedure Act and demonstrate that the injury from the challenged agency action falls within the "zone of interests" protected by NEPA. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990); *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 686 (1973).

In *Rio Hondo*, the Tenth Circuit held "that because the [organization] seeks to protect its recreational, aesthetic, and consumptive interests in the land and water surrounding their village, their alleged injuries fall within the 'zone of interests' that NEPA was designed to protect." *Rio Hondo*, 102 F.3d at 448; *N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, No. Civ. 98-367M/JHG, 1999 WL 34797509, at *11 (D.N.M. Dec. 22, 1999) (stating that the loss of opportunities to recreate in wolf recovery areas, concerns about a heightened threat to other animals and plants in the area, and loss of aesthetic opportunities are all injuries within the zone of interests protected by NEPA).

Similarly, in this case CPI seeks to protect its recreational, aesthetic, and consumptive interests in and around the prairie dog colonies throughout Colorado. (Doc. # 25 at 7–8.) CPI members also expressed concern about the impact prairie dog management operations could have on other species and plants in the area. (Doc. # 1 at 4.) These alleged injuries fall within the zone of interests that NEPA protects.

Second, the constitutional requirement of standing mandates that a plaintiff demonstrate the following three elements: (1) that an "injury in fact" occurred—that is, that a concrete harm was actually or will be imminently suffered; (2) that the defendant caused the injury, meaning that there is a fairly traceable connection between the injury and the complained-of conduct; and (3) that a favorable decision will likely redress the alleged injury. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-04 (1998). The Court finds that CPI satisfies these three elements and therefore has constitutional standing.

    1.    <u>Injury in Fact</u>

A party seeking standing must have suffered an "injury in fact." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). This requires an invasion of a legal and cognizable interest that is "concrete and particularized" and "actual or imminent" as opposed to "conjectural or hypothetical." *Id.* "[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Id.* at 562–63.

CPI provided an affidavit by one of its members, Helen Taylor, who expressed both her desire to observe prairie dogs and other animals and her concern about the survival of these animals due to the Agency's actions. (Doc. # 25-1.) CPI's position is that the Agency's failure to conduct an EIS or even an EA as required by NEPA "threatens to continue to harm [its] members' enjoyment of prairie ecosystems in the future." (Doc. # 25 at 7.) CPI therefore asserted a cognizable interest for the purpose of standing. The question is whether enough facts have been alleged to demonstrate that

the threat to this cognizable interest "directly affects" members of CPI apart from their "special interest" in the subject. *Lujan*, 504 U.S. at 562–63.

The Agency submits that CPI failed to establish specific facts of an actual, concrete, and particularized injury. (Doc. # 31 at 18.) It maintains that CPI's broad statements that its members use unspecified portions of the entire State of Colorado are insufficient to establish standing. (*Id.* at 19 n.2.) Moreover, it claims that Ms. Taylor's affidavit fails to establish standing because there is no evidence that she uses any of the specific areas actually affected by the challenged activity. (*Id.* at 19.)

In making its determination, the Court should focus on the statutory context, meaning that the injury in fact should be evaluated within NEPA. *See Rio Hondo*, 102 F.3d at 449. NEPA establishes procedures, such as conducting EAs, that agencies must follow prior to undergoing any action to protect and promote environmental quality. 42 U.S.C. §§ 4332(2)(C)(i)–(v). An agency that fails to follow the prescribed procedures creates a risk of serious environmental harm. *Rio Hondo*, 102 F.3d at 448. Such risk constitutes "the type of injury the National Environmental Policy Act was designed to prevent." *Id.* at 449. Thus, under NEPA, "an injury of alleged increased environmental risks due to an agency's uninformed decisionmaking may be the foundation for injury in fact under Article III." *Id.*

Indeed, as the Ninth Circuit stated, "[p]rocedural failures in [EIS] preparation create a risk that environmental impacts will be overlooked and provide sufficient 'injury in fact' to support standing." *Oregon Envtl. Council v. Kunzman*, 817 F.2d 484, 491 (9th Cir. 1987). Even in *Lujan*—a case which the Agency strongly relies on—the Supreme

Court noted that an individual near an affected site had standing to challenge the agency's failure to prepare an EIS. *Lujan*, 504 U.S. at 572 n.7. The Supreme Court in *Lujan* stated that a person who is accorded a procedural right to protect cognizable interests can assert that right "without meeting all the normal standards of redressability and immediacy." *Id.* Thus, the mere allegation of a procedural violation is a strong presumption that the injury in fact prong of standing is met.

Because standing requires that a plaintiff be among the injured, the Tenth Circuit also requires that a plaintiff demonstrate not only that the agency created an increased risk of environmental harm but also that such risk injures the plaintiff's concrete and particularized interests. *Rio Hondo*, 102 F.3d at 449. A plaintiff demonstrates that its concrete and particularized interests are injured when there is a geographical nexus to the site of the agency action.[1] *Id.* A geographical nexus is established where a plaintiff "may be expected to suffer the environmental consequences of the action" being challenged. *Id.*

---

[1] The Agency argues that the Supreme Court already rejected this line of argument. (Doc. # 31 at 19 n.2.) Indeed, the Court in *Lujan* rejected various nexus arguments by stating that "a plaintiff claiming injury from environmental damage must use the area affected by the challenged activity and not an area roughly 'in the vicinity' of it." *Lujan*, 504 U.S. at 565-66. The plaintiffs in *Lujan* were challenging actions taken in Egypt, and the Court stated that it is speculation and fantasy "to say that anyone who observes or works with an endangered species, anywhere in the world, is appreciably harmed by a single project affecting some portion of that species with which he has no more specific connection." *Id.* at 567. This case is different however. The Agency undertakes many prairie dog control operations in Colorado and CPI's members are continually recreating throughout the entire state. Further, the areas affected are not only the areas where the Agency specifically acted in. In rejecting the various nexus theories, the Supreme Court did not narrow the scope of an injury in fact to only the site where the agency action takes place; areas affected—and wildlife species affected—by the agency action are included too.

For example, in *Rio Hondo*, the Tenth Circuit found that there was a geographical nexus because the plaintiffs lived twelve to fifteen miles downstream from the site of the agency action. *Rio Hondo*, 102 F.3d at 450–51. The plaintiffs in that case used the area for recreation and used the river for irrigation, fishing, and swimming. *Id.* at 450. Likewise, the Ninth Circuit held in *Kunzman* that the plaintiffs in Oregon had standing to challenge a nationwide program to combat infestations of gypsy moths because the plaintiffs resided in a state with an actual gypsy moth problem. *Kunzman*, 817 F.2d at 491. Thus, the Ninth Circuit concluded that the plaintiffs had a "sufficient geographical nexus to the site of the challenged project that [they] may be expected to suffer whatever environmental consequences the project may have." *Id.* (citations omitted).

In this case, the Agency controls and removes prairie dogs all over the State of Colorado. It is therefore neither pure speculation nor fantasy to hold that the Agency's alleged failure to follow the procedures established in NEPA jeopardized and will continue to jeopardize CPI's interest in preserving and enjoying the prairie ecosystems in the state. In representing its members, CPI is accorded the procedural rights under NEPA to protect these cognizable interests.

The fact that Ms. Taylor did not traverse the specific areas is not fatal to CPI's claim. The record demonstrates that prairie dogs—and the different animals that rely on these prairie dogs, such as eagles, hawks, and wolves—roam across boundaries. While she has not been to the specific areas where the challenged actions in this case are located, she has been near them and will continue to recreate in nearby affected areas. *See* (Doc. # 25-1 at 2–3.) Because the interests and areas affected go beyond the

specific locations of the Agency's actions, there is a sufficient geographical nexus to find standing.

Accordingly, the Court finds that CPI has established an injury in fact under NEPA.

2.    Causation

Proving causation requires that a plaintiff show that its injuries are fairly traceable to the agency action. *Lujan*, 504 U.S. at 560-61. Under NEPA, CPI must simply show that the increased risk of environmental harm is fairly traceable to the Agency's failure to comply with the statute. *See Rio Hondo*, 102 F.3d at 449. The parties in this case do not question causation. *See* (Doc. ## 25 at 7–8; 31 at 18–24.) The Court is also satisfied that the causation requirement is met because the risk of environmental harm to the prairie ecosystems is fairly traceable to the Agency's alleged failure to properly assess the impact of its actions.

3.    Redressability

A plaintiff satisfies the redressability prong of standing by establishing that it is likely and not merely speculative that an injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 561. A plaintiff asserting procedural rights under NEPA does not need to demonstrate that the ultimate agency decision would be different if the agency complied with the statute. *Rio Hondo*, 102 F.3d at 452 (noting that the standards for redressability under NEPA are "relaxed"). Notably, a person asserting a procedural right "to protect his concrete interests can assert that right without meeting the normal

standards for redressability[.]" *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009); *Lujan*, 504 U.S. at 572 n.7.

In this case, a favorable decision would sufficiently redress CPI's suffered injuries and future injuries by ensuring that the Agency complies with NEPA. The fact that the Agency's actions concluded before the end of this case does not defeat the redressability requirement. Although both parties stressed that this was not a mootness issue, the Court finds that it is useful to consider principles of mootness for the purposes of redressability under NEPA. Indeed, the Agency's actions in this case "were too short to be fully litigated prior to cessation, and there is reasonable expectation that the same complaining parties may be subjected to the same actions again." *Int'l Ctr. for Tech. Assesment v. Johanns*, 473 F.Supp.2d 9, 23 (D.D.C. 2007) (finding despite the completion of the agency's action that the plaintiffs had standing and that their claims were not moot).

CPI claims that the Agency risked serious environmental harm by overlooking the effects of its actions. This failure continues to threaten and injure CPI, and a favorable decision by the Court would redress this harm. It is irrelevant under NEPA whether the Agency's ultimate decision would change. The Court is therefore satisfied that CPI has standing to bring this case.

## B.    MERITS OF NEPA CHALLENGE

CPI claims that the Agency failed to take the required steps before categorically excluding its actions from environmental analysis. As the Court previously explained, NEPA allows agencies to use categorical exclusions for "actions which do not

individually or cumulatively have a significant effect on the human environment."

40 C.F.R. § 1508.4. However, when a decision maker determines that an otherwise

categorically excluded action has the potential to "significantly" affect the quality of the

environment, the Agency must prepare an EA or EIS. 7 C.F.R. § 372.5(d);

40 C.F.R. § 1508.4.

In this case, the Agency rationally concluded that its categorical exclusion

applied and properly determined that no "significant" effect warranted an exception.

1. The Agency rationally interpreted and applied its categorical exclusion regulation.

An agency's interpretation and application of its own regulation must be given

"controlling weight" unless it is "plainly erroneous or inconsistent with the regulation."

*Thomas Jefferson*, 512 U.S. at 512. Here, the Agency's regulation regarding

categorically excluded actions notes that "[t]he means through which adverse

environmental impacts may be avoided or minimized have actually been built right into

the actions themselves." 7 C.F.R. § 372.5(c). Thus, there is "relatively little analysis"

required by the Agency once it determines that a project "fits within the four corners of a

categorical exclusion." *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 750 (10th Cir.

2006); *Cal. v. Norton*, 311 F.3d 1162, 1175–76 (9th Cir. 2002) (stating that "[i]n many

instances, a brief statement that a categorical exclusion is being invoked will suffice").

Moreover, there is no particular process an agency must follow to determine

whether a categorical exclusion applies, and so long as the agency articulates a rational

basis for its decision and considers all the relevant factors, its decision will be upheld.

*Copart, Inc. v. Administrative Review Bd.*, 495 F.3d 1197, 1202 (10th Cir. 2007); *Ctr. for*

*Food Safety v. Johanns*, 451 F.Supp.2d 1165, 1175–76 (D. Haw. 2006) (citing *Norton*, 311 F.3d at 1176).

In this case, the Agency's regulation holds that the Agency can categorically exclude those actions which are "routine measures," such as routine wildlife "removals" and "control." 7 C.F.R. § 372.5(c)(1)(i). If the Agency proposes to use hazardous substances, which it did in this case, the exclusion applies only if the use (1) is localized or contained in areas where humans are not likely to be exposed, (2) does not cause contaminants to enter water bodies, (3) does not adversely affect any federally protected species or critical habitat, and (4) does not cause bioaccumulation. 7 C.F.R. § 372.5(c)(1)(i)(A)–(D). Accordingly, the regulation for routine measures requires that the Agency make four findings. *Comm. for Idaho's High Desert v. Collinge*, 148 F.Supp.2d 1097, 1102–03 (D. Idaho 2001). Without any findings to review, the Court "cannot determine whether the agency's application of a categorical exclusion to a particular project is arbitrary and capricious[.]" *Id.* at 1103. The Agency in this case, however, properly made the four findings required for it to issue its categorical exclusion.

Preliminarily, CPI argues that the Agency's actions are not routine measures because they are distinguishable from the examples that the regulation provides.[2] (Doc. # 25 at 21.) The Agency replies that the listed examples are not exhaustive, that it

_____

[2] The regulation states that examples of routine measures include:
    (A) Inoculation or treatment of discrete herds of livestock or wildlife undertaken in contained areas (such as a barn or corral, a zoo, an exhibition, or an aviary);
    (B) Pesticide treatments applied to infested plants at a nursery; and
    (C) Isolated (for example, along a highway) weed control efforts.
7 C.F.R. § 372.5(c)(1)(ii).

would make little sense that routine measures could be employed in zoos of eighty to two hundred sixteen acres but not to the smaller parcels of six and seventy acres at issue in this case. (Doc. # 31 at 28.) The Agency goes on to state that the regulation lists twelve types of routine measures while only providing three examples, none of which address "removals" or "controls." (*Id.*)

The Court finds that the Agency's interpretation—which must be given controlling weight—is not plainly erroneous or inconsistent with the regulation. CPI's argument that the Agency's actions in this case are not routine measures as envisioned by the regulation is not persuasive.

With respect to the four criteria for a categorical exclusion of a routine measure, the Court finds that the Agency properly applied its regulation to find that the challenged actions were routine measures. The actions were localized, and the Agency determined that no threat to human health or safety existed. (AR at 2, 6.)

The Agency also noted in its categorical exclusion record that no contaminants would enter any water bodies. (*Id.*) CPI argues that the Agency's failure to mention any water bodies near the sites evidences a lack of analysis by the Agency. (Doc. # 25 at 23.) The Agency explicitly noted, however, that the proposed actions "will not cause contaminants to enter bodies of water." (AR at 2, 6.) The Court has no reason to distrust this assertion, especially given the fact that CPI failed to identify any bodies of water near the sites after the Agency challenged CPI in its response brief to identify bodies of water potentially affected. *See* (Doc. # 31 at 29–30 n.12.)

Finally, the Agency determined that the actions would not cause bioaccumulation or adversely affect any federally-protected species or critical habitat. (AR at 2, 6.)

The Agency was not required to make any extensive findings regarding its use of a categorical exclusion. *See Bosworth*, 443 F.3d at 750 (noting that there is little analysis an agency must conduct once it determines a project fits within a categorical exclusion).The record demonstrates that the Agency considered all the relevant factors, articulated a rational basis for its decision, and provided evidence showing that it considered the four criteria for each action. The Court finds that the Agency's decision was neither arbitrary nor capricious.

2. The Agency rationally concluded that there were no extraordinary circumstances.

While NEPA permits agencies to use categorical exclusions for actions that do not significantly affect the environment, agencies must also provide for "extraordinary circumstances in which a normally excluded action may [have] a significant environmental effect." 40 C.F.R. § 1508.4. Hence when a decision maker determines that a categorically excluded action may significantly affect the quality of the environment, an EA or EIS must be prepared. 7 C.F.R. § 372.5(d). Such actions include routine measures, "the incremental impact of which, when added to other past, present, and reasonably foreseeable future actions . . . [have] the potential for significant environmental impact[.]" 7 C.F.R. § 372.5(d)(1).

As noted above, there is no particular process a decision maker must follow to determine whether an exception to a categorical exclusion applies, and so long as the agency articulates a rational basis for its decision and considers all the relevant factors,

its decision will be upheld. *Copart*, 495 F.3d at 1202; *Johanns*, 451 F.Supp.2d at 1175–76 (citing *Norton*, 311 F.3d at 1176). Additionally, where there is substantial evidence in the record that exceptions to the categorical exclusion may apply, "the agency must at the very least explain why the action does not fall within one of the exceptions." *Norton*, 311 F.3d at 1177.

Consequently, an agency must produce some evidence regarding whether an exemption from a categorical exclusion applied so the reviewing court can determine whether the action was arbitrary and capricious. *Ctr. for Food Safety v. Vilsack*, No. 10-04038, 2010 WL 3835699, at *7 (N.D. Cal. Sept. 28, 2010) (holding that the agency failed to "articulate a reason to support its findings that [its actions] when considered in conjunction with reasonably foreseeable future actions . . . would not have any potential significant environmental impact"); *Int'l Ctr. for Tech. Assesment v. Johanns*, 473 F. Supp. 2d 9, 29 (D.D.C. 2007); *Johanns*, 451 F. Supp. 2d at 1186.

In this case, the Agency stated that there were "no extraordinary circumstances anticipated which might result in a significant effect on the human environment even when considered along with other past, present, and reasonably foreseeable future actions." (AR at 2, 6.) The Agency substantiated this conclusion by finding that its actions "will have no bearing on the overall population of black-tailed prairie dogs." (AR at 1.) It partly based its reasoning on the fact that studies demonstrated that "prairie dog populations in Colorado are not being impacted by control efforts in the State." (*Id.*) There is no substantial evidence presented contrary to the Agency's position. Because

the Agency properly presented evidence for its decision, the Court is satisfied that the Agency's actions were not arbitrary or capricious.

## VI. CONCLUSION

The Court holds that the Agency's actions in removing and controlling prairie dogs were not arbitrary, capricious, or otherwise contrary to law. The Agency made the requisite findings pertinent to its categorical exclusion. It also determined that no extraordinary circumstances existed. Its actions are permitted pursuant to NEPA. The Court is therefore satisfied from the record that the Agency complied with its obligations under NEPA and the Administrative Procedure Act. The Court AFFIRMS the Agency's actions.

DATED:  March 30, 2018

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge